IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

JOHN KATILA,

        Plaintiff,

    vs.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

CASE NO.  5:19-CV-02822-JDG


MAGISTRATE JUDGE
JONATHAN D. GREENBERG

**MEMORANDUM OF OPINION AND
ORDER**


Plaintiff John Katila ("Plaintiff" or "Katila") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In December 2016, Katila filed an application for POD and DIB, alleging a disability onset date of March 1, 2014 and claiming he was disabled due to: popliteal aneurysm; peripheral vascular disease; aortic root dilation; diabetes mellitus; obstructive sleep apnea; arthritis in both knees; blood clot in right leg; hypertension; anxiety; and depression.  (Transcript ("Tr.") at 15, 231.)  The application was denied initially and upon reconsideration, and Katila requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

On September 28, 2018, an ALJ held a hearing, during which Katila, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On November 2, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-28.)  The ALJ' s decision became final on November 2, 2019, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On December 5, 2019, Katila filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.)  Katila asserts the following assignments of error:

(1) The ALJ erred in weighing the opinion of Dr. Christopher Young, M.D., one of Plaintiff's treating physicians.

(2) The ALJ erred in evaluating the vocational evidence in the claim, and in failing to resolve significant conflicts in that evidence.

(Doc. No. 15 at 18, 21.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Katila was born in March 1961 and was 57 years-old at the time of his administrative hearing (Tr. 206), making him a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(e).  He has a college education and is able to communicate in English.  (Tr. 53.)  He has past relevant work as a marketing supervisor/director and advertising executive.  (*Id.* at 27.)

### B.  Relevant Medical Evidence[2]

On March 13, 2014, Katila saw Daniel Turner, D.O.  (*Id.* at 808.)  At that visit, Mr. Katila described feeling depressed and anxious, including feeling like his heart was racing and that he was sweating a lot.  (*Id.*)  Katila told Dr. Turner for the past few months he had increased thirst and felt like

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Plaintiff does not challenge any findings related to his mental impairments (Doc. No. 15 at 3), the medical evidence included in this opinion is limited to Plaintiff's physical impairments.

his mouth was very dry and sticking together.  (*Id.*)  Dr. Turner noted Katila drank a bottle of wine a night, almost every night.  (*Id.*)  Katila complained of "chronic pain and discomfort" in his left leg post-surgery.  (*Id.* at 809.)  On examination, Dr. Turner found Katila had intact muscle strength of 5/5 diffusely, as well as normal range of motion.  (*Id.*)  Dr. Turner noted Katila had leg claudication with occasional pain.  (*Id.*)  Katila's fasting glucose check was 267 and his urine analysis was positive for glucose > 2000 and trace blood.  (*Id.*)  Dr. Turner diagnosed Katila with diabetes mellitus and prescribed Metformin to control Katila's blood sugar.  (*Id.* at 810.)

On March 20, 2014, Katila went to the emergency room at the Cleveland Clinic's Twinsburg location after falling down a flight of stairs when he lost his footing.  (*Id.* at 804.)  Katila reported hitting his head and complained of right ankle and right foot pain.  (*Id.*)  Katila rated his pain at a 3/10.  (*Id.*)  He denied any loss of consciousness, neck pain, and back pain.  (*Id.*)  On examination, Katila exhibited a normal range of motion, tenderness, and no edema.  (*Id.* at 806.)  A head CT and x-rays of his right ankle and foot were normal.  (*Id.*)  Treatment providers gave Katila an air cast and crutches, advised him to ice and elevate his foot, take Motrin for pain as needed, and to follow up with his doctor.  (*Id.*)

On April 22, 2014, Katila saw Dr. Turner for follow up of his diabetes, hypertension, hyperlipidemia, and a fall at home.  (*Id.* at 797.)  Katila reported his right ankle was "75% improved" but was still having some pain and edema in his right leg.  (*Id.*)  He was able to walk with pain.  (*Id.*)  On examination, Dr. Turner found intact strength, range of motion, and sensation in Katila's feet, pain in the right medial ankle, decreased Doppler pedal pulses in the legs, with the left worse than the right, varicosities in the feet bilaterally, and a callus on the right third toe pad.  (*Id.* at 798.)  Dr. Turner noted Katila continued to consume excess carbohydrates and alcohol.  (*Id.* at 797.)  Dr. Turner "emphasized" the need for Katila to make lifestyle and dietary changes.  (*Id.* at 798.)

On May 14, 2014, Katila saw David Naar, M.D., for "non-invasive studies" after having surgery for repair of a popliteal aneurysm and left femoral popliteal bypass in 2011. (*Id.* at 795.) Katila reported doing the same and denied pain at rest. (*Id.*) Dr. Naar noted Katila remained asymptomatic. (*Id.*) The studies conducted showed a normal right ankle at rest and moderate disease at rest of the left ankle. (*Id.*)

On June 20, 2014, Katila saw Susan Perez, CNP, after being referred by Dr. Turner for diabetes and hyperlipidemia education and management. (*Id.* at 784.) Katila reported his feet were hurting more, and he was experiencing aching, tingling pain in both feet. (*Id.*) Nurse Perez noted Katila had stopped drinking. (*Id.*) On examination, Nurse Perez found a normal gait, "vibratory perception decreased bilaterally" in Katila's feet, and found it "[d]ifficult to palpate distal pulses." (*Id.* at 788.) Katila's lower extremities were warm with normal hair distribution. (*Id.*) Nurse Perez noted Katila had better glycemic control. (*Id.* at 789.) She urged him to schedule an appointment with podiatry for his painful callouses, as well as schedule an appointment with his vascular doctor given his claudication symptoms and her difficulty in assessing his distal pulses. (*Id.*)

On July 22, 2014, Katila saw Nurse Perez for follow up. (*Id.* at 778.) Katila reported his toes hurt as times, and he had seen Dr. Peters for treatment of his callouses. (*Id.*) Dr. Peters felt his toe pain was related to narrow toe boxes of his shoes. (*Id.* at 778-79.) Katila told Nurse Perez shoe inserts helped with his calf discomfort. (*Id.* at 779.) On examination, Nurse Perez found a normal gait and trace bilateral edema in the lower extremities. (*Id.* at 782.)

On July 29, 2014, Katila saw Carlos Hubbard, M.D., for follow up regarding his hypertension, peripheral arterial disease, and enlarged aortic root. (*Id.* at 776.) Katila reported doing well, with no chest pain or shortness of breath. (*Id.*) Dr. Hubbard 's impressions consisted of the following: "Other than his usual leg pain he is doing quite well from the cardiovascular standpoint. Blood pressure is well controlled

as his heart rate on his current regimen." (*Id.* at 777.)  Dr. Hubbard recommended a repeat echocardiogram on Katila's next visit to reassess his aortic root. (*Id.*)

On October 22, 2014, Mr. Katila saw Perry Funk, D.O., to establish care. (*Id.* at 766.)  Katila reported he had developed numbness and tingling in his extremities over the past few months. (*Id.*)  He had been taking his wife's Neurontin for this, which he found helped the numbness and tingling as well as his mood, but admitted taking a higher dose. (*Id.*)  Dr. Funk diagnosed Katila with diabetic neuropathy, and prescribed Gabapentin. (*Id.* at 768.)

On February 4, 2015, Katila saw Dr. Hubbard for a six month follow up appointment with echocardiogram. (*Id.* at 375.)  Katila reported "doing quite well" since his last visit, but admitted he was not paying as much attention to his diet and exercise. (*Id.*)  Katila told Dr. Hubbard his ability to exercise was limited by his leg pain. (*Id.*)  However, Katila denied leg pain at rest. (*Id.*)  Katila also denied chest pain and shortness of breath. (*Id.*)  On examination, Dr. Hubbard found no edema of the extremities. (*Id.* at 377.)  An echocardiogram showed some enlargement of the aortic root, as compared with a prior echocardiogram from 2013, but the degree of expansion did not require intervention at that time. (*Id.*)  However, Dr. Hubbard advised Katila he could not do heavy lifting with exercise, although Dr. Hubbard encouraged other aerobic activity. (*Id.*)  Dr. Hubbard recommended another echocardiogram in six months. (*Id.*)

On May 5, 2015, Katila saw Nurse Perez for follow up of his diabetes management. (*Id.* at 385.)  Katila admitted he had not been checking his blood sugars since he went on vacation the end of March. (*Id.*)  Nurse Perez noted Katila was having issues with his knees, so he was not exercising. (*Id.*)  Katila reported his diet was "pretty good," and he had lost five pounds since his last visit. (*Id.*)  Mr. Katila told Nurse Perez his feet and hands tingled on and off, mostly later in the day, but less than before. (*Id.*)  Neurontin helped. (*Id.*)  Nurse Perez noted sobriety from alcohol since April 2014. (*Id.*)  On examination,

Nurse Perez found a normal gait and trace pitting edema in the bilateral lower extremities.  (*Id.* at 389.) Katila was wearing compression hose.  (*Id.*)  Nurse Perez found Katila's glycemic control was stable.  (*Id.* at 390.)  Katila agreed to get back into the routine of checking his blood sugar levels.  (*Id.*)

On May 11, 2015, Katila saw Dr. Funk for medication review and diabetes management.  (*Id.* at 398.)  Katila told Dr. Funk he was aware he needed to check his glucose levels more regularly.  (*Id.*) Katila reported his knees were an issue, and Dr. Funk noted degenerative joint disease.  (*Id.*)  Katila told Dr. Funk he had just resumed glucosamine/chondroitin and it helped.  (*Id.*)  Dr. Funk noted Katila's aortic root was slowly increasing in size.  (*Id.*)

On May 20, 2015, Katila underwent a Doppler ultrasound of his legs to evaluate his peripheral artery disease.  (*Id.* at 548.)  The ultrasound revealed Katila had an abnormal ankle brachial index on the left at rest.  (*Id.* at 549.)  The right side was normal.  (*Id.*)  Lincoln Roland, M.D., noted these results were "essentially unchanged" from the results of a May 2014 study.  (*Id.*)

On August 10, 2015, Katila saw Nurse Perez for follow up of his diabetes and hyperlipidemia management.  (*Id.* at 413.)  Katila again reported not checking his blood sugar after going on vacation, this time in July, and falling off his routine.  (*Id.*)  Katila had been working in his yard and walking a little. (*Id.*)  If he walked too much, his knees and hips hurt.  (*Id.*)  Katila reported the burning in his feet, the tingling in his hands, and the "insatiable itching sensation" between his toes was much less than before with the gabapentin.  (*Id.*)  Katila complained of more fatigue when he woke up and during the day, but his sleep had been up and down and he had not been using his CPAP machine much lately.  (*Id.*)  Katila told Nurse Perez his calf hurt if he walked long distances, but the pain was relieved with rest.  (*Id.*)

On examination, Nurse Perez found a normal gait, trace pitting tense edema bilaterally, decreased vibratory perception of the feet bilaterally, and lower extremities that were warm with diminished normal hair distribution.  (*Id.* at 417.)  Nurse Perez was unable to palpate distal pulses.  (*Id.*)

On August 12, 2015, Katila saw Dr. Hubbard for a six month follow up appointment with echocardiogram.  (*Id.* at 427.)  Dr. Hubbard noted that day's echocardiogram showed no increase in size of the aortic root.  (*Id.*)  Katila reported he was asymptomatic and had been doing "very well."  (*Id.*)  Dr. Hubbard told Katila to follow up in one year with echocardiogram.  (*Id.* at 429.)

On November 6, 2015, Katila saw Christopher Young, M.D., for review of his medical problems. (*Id.* at 433.)   On examination, Dr. Young found no edema.  (*Id.* at 435.)  Dr. Young did note a skin rash with central clearing on Katila's chest.  (*Id.*)

On November 10, 2015, Katila saw Nurse Perez for follow up of his diabetes and hyperlipidemia. (*Id.* at 440.)  Katila admitted he had not checked his blood sugar since July 15, 2015.  (*Id.*)  Katila reported he ran out of a gabapentin a week ago because he was taking more than he should.  (*Id.*)  Dr. Perez noted Katila had lost 11 pounds since his last visit.  (*Id.*)  Katila reported his sleep was terrible, but he was not using his CPAP machine.  (*Id.*)  On examination, Nurse Perez found a normal gait, trace pitting tense edema bilaterally, decreased vibratory perception of the feet bilaterally, lower extremities that were warm with diminished normal hair distribution, thickened toenail on the third toe on the right, and varicosities on the right lower extremity.  (*Id.* at 444.)  Nurse Perez was unable to palpate distal pulses.  (*Id.*)  Nurse Perez noted Katila's neuropathic symptoms were worsening in his feet, and Katila had been taking more gabapentin to control his symptoms even though he was on a full dose.  (*Id.* at 445.)  Nurse Perez referred Katila to neurology for management.  (*Id.*)

On February 10, 2016, Katila saw Nurse Perez for follow up.  (*Id.* at 296.)  Katila admitted he had not checked his blood sugar since July 15, 2015 and had gotten "'sloppy'" in managing his diabetes.  (*Id.*) Nurse Perez noted Katila had gained nine pounds since his last visit.  (*Id.*)  Katila reported his diet had not been as good and he was having more desserts.  (*Id.*)  Katila felt okay, although some days were better than others, but he was having trouble motivating himself to maintain his diet.  (*Id.*)  Nurse Perez noted

7

Katila continued to have burning pain in his feet, tingling in his hands, and an "insatiable itching" between his toes; Neurontin helped, but not completely.  (*Id.*)

On examination, Nurse Perez found a normal gait, trace pitting tense edema bilaterally, decreased vibratory perception of the feet bilaterally, lower extremities that were warm with diminished normal hair distribution, thickened toenail on the third toe on the right, and varicosities on the right lower extremity. (*Id.* at 300.)  Nurse Perez was unable to palpate distal pulses.  (*Id.*)  Nurse Perez noted Katila wanted a neurology consult regarding his neuropathy.  (*Id.* at 301.)

On May 6, 2016, Katila underwent x-ray imaging of his knees.  (*Id.* at 475.)  The imaging revealed bilateral primary osteoarthritis of the knee.  (*Id.*)

That same day, Katila saw Dr. Young for the degenerative joint disease in his knees, which was becoming a "quality of life issue."  (*Id.* at 465.)  On examination, Dr. Young found no edema.  (*Id.* at 468.)  Dr. Young referred Katila for a physical therapy consultation.  (*Id.* at 469.)

On June 1, 2016, Katila began physical therapy for his knees.  (*Id.* at 477.)  Timothy Nugent, PT, completed an initial physical therapy evaluation.  (*Id.*)  Katila reported bilateral knee pain, with chronic left knee swelling, increased pain at night, and difficulty climbing stairs.  (*Id.*)  Katila rated his left knee pain as a 6/10 and his right knee as a 5/10 but a constant ache.  (*Id.*)  Nugent found Katila presented with poor strength, limited stair tolerance, antalgic gait, decreased range of motion, and limited squat/bending tolerance.  (*Id.* at 478.)  Nugent assessed Katila's prognosis as "excellent."  (*Id.*)

On June 14, 2016, Katila saw Sotero Peralta, M.D., for a yearly follow up examination.  (*Id.* at 346.)  Katila reported throbbing, burning pain in his knees bilaterally.  (*Id.*)  Katila told Dr. Peralta he would get unbearable knee pain after sitting in his car for long periods, and the next day his knees would be stiff for hours.  (*Id.*)  Katila complained of numbness and tingling in both feet, but the Neurontin he took seemed to help.  (*Id.*)  On examination, Dr. Peralta found no edema and palpable pulses.  (*Id.* at 348.)

Dr. Peralta's impressions consisted of "right popliteal artery aneurysm right 1.2 cms, left side occluded." (*Id.*)  Dr. Peralta referred Katila to orthopedics for his knee pain.  (*Id.*)  Dr. Peralta determined Katila's vascular studies were stable with no changes, no compromise of the left lower extremity, and that Katila had a "small ectasia right popliteal artery."  (*Id.*)  Katila was to follow up in one year.  (*Id.*)

On June 20, 2016, Katila saw Bruce Cohn, M.D., for his knee pain.  (*Id.* at 652.)  Katila reported difficulty with walking, stairs, standing, and pushing/pulling objects.  (*Id.*)  Katila told Dr. Cohn he had been doing aquatic therapy and physical therapy at his primary care physician's instruction.  (*Id.*)  On examination, Dr. Cohn found bilateral swelling and tenderness along the medial and lateral joint line, as well as a decrease in range of motion in extension, with positive McMurray's and flexion pinch tests.  (*Id.* at 653-654.)  Dr. Cohn determined both knees exhibited a fixed flexion contracture and Katila walked with an antalgic gait.  (*Id.*)  While both feet were warm, Dr. Cohn could not detect a dorsalis pedis or posterior tibial pulse bilaterally.  (*Id.*)

Dr. Cohn diagnosed Katila with bilateral primary osteoarthritis of the knees, with the right side worse than the left, and he administered a steroid injection to the right knee.  (*Id.* at 654-55.)  Knee x-rays taken that day revealed "bone on bone medial compartment" bilaterally.  (*Id.* at 655.)  Dr. Cohn found Katila was capable of full weight bearing and light duty work.  (*Id.*)  Dr. Cohn ordered Katila to return in a week for a steroid injection to the left knee.  (*Id.*)

On June 27, 2016, Dr. Cohn administered a steroid injection to Katila's left knee.  (*Id.* at 658.)

On July 6, 2016, Katila attended his third physical therapy visit.  (*Id.* at 485.)  Katila reported his knees were the same, and his left leg felt more sore that day.  (*Id.*)  Katila told PT Nugent he had received cortisone injections in both knees and the injections had not helped much.  (*Id.*)  Katila reported walking in the water three times a week and felt that it helped but admitted he had not been doing his other home exercises.  (*Id.*)  Katila rated his pain at a 6/10, with the left worse than the right, and described his pain as

constant and stabbing.  (*Id.*)  On examination, Nugent found no tenderness to palpation.  (*Id.*)  Nugent also found Katila had a "slight improvement" in range of motion of the knee since his last visit, although he noted Katila's pain had not decreased after the injections.  (*Id.* at 486.)

On July 13, 2016, Katila returned Dr. Cohn for follow up.  (*Id.* at 661.)  Katila reported his knees were not much better and he did not get relief with either injection.  (*Id.*)  Katila also complained of a new pain in his left knee.  (*Id.*)  Katila further reported pain with driving.  (*Id.*)  Katila's pain came and went, and it kept him up at night.  (*Id.*)  Dr. Cohn noted Katila had just started taking a collagen supplement.  (*Id.*)  Dr. Cohn's examination revealed identical findings as those from the June 20, 2016 visit.  (*Id.* at 662.)  Dr. Cohn recommended Plaintiff undergo a series of viscosupplementation injections.  (*Id.* at 663.)

Beginning in August 2016, after insurance approval, Katila underwent a series of five viscosupplementation injections in his left knee.  (*Id.* at 665-73.)  As of the fifth such injection, Katila rated his left knee pain as a 3/10.  (*Id.* at 673.)

On August 14, 2016, Nugent discharged Katila from physical therapy after he failed to return to therapy or schedule additional follow up appointments.  (*Id.* at 489.)  Nugent noted that as of the most recent progress report, Katila was progressing as expected toward functional goals.  (*Id.*)

On August 16, 2016, Katila saw Dr. Hubbard for his one-year follow up with echocardiogram.  (*Id.* at 310.)  Katila reported he was doing well overall, with no significant cardiac complaints, but he had shortness of breath that he attributed to his knee pain and general exercise.  (*Id.*)  Katila told Dr. Hubbard he was trying to be more active but was still struggling with losing weight.  (*Id.*)  On examination, Dr. Hubbard found trivial pedal edema.  (*Id.* at 312.)  Dr. Hubbard determined from a cardiac standpoint Katila was doing well.  (*Id.*)  Dr. Hubbard told Katila calorie restriction and calorie counting would help with weight loss, which should improve Katila's blood pressure and diabetes management.  (*Id.*)  The yearly echocardiogram showed no change in the aortic root.  (*Id.* at 318.)

10

On October 7, 2016, Katila saw Dr. Cohn to receive the first of five viscosupplementation injections to his right knee.  (*Id.* at 676.)  However, on examination, Dr. Cohn found Katila had a positive Hoffman's sign and calf tenderness of the left leg.  (*Id.*)  Dr. Cohn ordered an immediate ultrasound of the left leg to rule out deep vein thrombosis ("DVT").  (*Id.* at 677.)

The ultrasound was positive for DVT and Dr. Cohn sent Katila to the emergency room.  (*Id.* at 356.)  While the DVT was found in the right leg, Katila complained that the pain and swelling was worse in his left leg.  (*Id.*)  On examination, treating providers found normal range of motion, no tenderness, and palpable Dopplar pedal pulses bilaterally.  (*Id.* at 359.)   Katila's right leg showed no tenderness, no swelling, and no deformity.  (*Id.*)  While Katila's left leg exhibited swelling and edema, there was no tenderness.  (*Id.*)  Treating providers prescribed the blood thinner Xarelto.  (*Id.* at 360.)

Thereafter, Katila underwent the remaining four viscosupplementation injections to his right knee, receiving the fifth and final injection on December 9, 2016.  (*Id.* at 680-86.)

On January 2, 2017, Katila went to the emergency room for treatment of a wound on his left lower extremity that was continuing to bleed as a result of his blood thinner.  (*Id.* at 953-54.)  Katila denied any leg pain.  (*Id.* at 953.)  On examination, treatment providers found normal range of motion, edema, and tenderness.  (*Id.* at 957.)  The treatment notes reflect "[c]hronic +1 pitting edema on lower extremities bilaterally," and "[v]enous stasis changes bilaterally."  (*Id.*)

On January 10, 2017, Katila saw Dr. Peralta for follow up.  (*Id.* at 1022.)  Katila reported he had gone to the emergency room in October 2016 for left leg pain and swelling and was diagnosed with a DVT in his right leg.  (*Id.*)  Katila complained of bilateral redness and swelling in his legs.  (*Id.*)  Katila told Dr. Peralta he was doing water therapy three to four days a week for thirty minutes.  (*Id.*)  Katila stated he was unable to walk for more than a few minutes because his legs would feel tired.  (*Id.*)  He would then need to rest for five to ten minutes before he could continue.  (*Id.*)  On examination, Dr.

Peralta found Katila's extremities to be warm, with no cyanosis or edema, and palpable pulses.  (*Id.* at 1023.)  Dr. Peralta believed Katila's lower extremity pain was likely musculoskeletal.  (*Id.*)  Dr. Peralta recommended Katila continue with his blood thinner for six months and follow up in one year.  (*Id.*)

On January 16, 2017, Katila saw Dr. Cohn for follow up.  (*Id.* at 1145.)  Katila reported the pain that kept him up at night had improved, although daily activities were "still a bit of a struggle."  (*Id.*)  On examination, Dr. Cohn found bilateral swelling, decreased extension, tenderness to the medial joint line, positive McMurray's and flexion pinch tests, and fixed flexion contracture.  (*Id.*)  Both knees showed a varus malalignment.  (*Id.*)  Dr. Cohn found Katila's left lower leg was also swollen.  (*Id.*)

On February 2, 2017, Katila saw Yolanda Duncan, M.D., for a consultative examination.  (*Id.* at 997.)  Katila complained of left leg post-surgery pain that made it difficult to walk and sit, and his left leg became fatigued easily.  (*Id.*)  Katila reported arthritis in his knees also made it difficult to walk.  (*Id.*)  Katila told Dr. Duncan that he was able to sit for about 15-20 minutes, stand about five to ten minutes, and was able to climb one flight of stairs, although he was exhausted when he got to the top.  (*Id.*)  Dr. Duncan noted Katila used a cane to walk but walked with a slow steady gait both with and without using it.  (*Id.* at 998.)

On examination, Dr. Duncan found a full range of motion in all four extremities, some stasis dermatitis on the left leg but none on the right, edema of the left leg but none on the right, and no cyanosis or clubbing.  (*Id.*)  Katila walked with a normal gait.  (*Id.*)  Heel-to-shin and joints were normal, although Katila did have some enlargement of the left ankle.  (*Id.*)  Dr. Duncan noted there was no tenderness, heat, or redness present.  (*Id.*)

Dr. Duncan opined that, based on her findings, Katila "may have difficulty with work-related physical activities such as standing more than 10 minutes, sitting more than 20 minutes, walking more than 5 minutes, or climbing a flight of stairs.  (*Id.*)

12

On March 13, 2017, Katila saw Dr. Cohn for follow up.  (*Id.* at 1148.)  Katila reported he was doing "fair," that the pain came and went, and that he had good days and bad days.  (*Id.*)  Katila told Dr. Cohn he took Tylenol as needed for pain.  (*Id.*)  Katila reported he "awful night pain" had subsided and he can sleep better.  (*Id.*)  Dr. Cohn noted Katila knew he was not a surgical candidate because of his weight and vascular problems.  (*Id.*)  On examination, Dr. Cohn found no swelling, decreased extension, tenderness to the medial joint line, positive McMurray's and flexion pinch tests, and fixed flexion contracture.  (*Id.* at 1149-50.)  On Katila's left leg, Dr. Cohn also found retropatellar pain.  (*Id.* at 1150.)  Dr. Cohn found normal muscle tone and sensation bilaterally.  (*Id.*)

On April 18, 2017, Katila saw Dr. Young for completion of his disability forms.  (*Id.* at 1019.)  Dr. Young noted Katila had chronic bilateral knee pain but was not a good surgical candidate because of his peripheral vascular disease.  (*Id.*)  He could not walk or stand for more than a few minutes.  (*Id.*)  Dr. Young also noted Katila used a cane.  (*Id.*)  On examination, Dr. Young found Katila was moving in pain and had poor leg circulation with knee joint pain.  (*Id.* at 1020.)  Dr. Young noted Katila had gotten some benefit from injections to his knees and had lost weight.  (*Id.*)

That same day, Dr. Young wrote a letter to the State Disability Agency stating he had seen Katila for a disability evaluation.  (*Id.* at 1043.)   Dr. Katila wrote in pertinent part as follows:

> Worsening leg pains over the past 5 yrs- sees vascular doc (Dr Peralta) for vascular disease in his legs- sees orth doc (Dr Bruce Cohn) for his arthritic knees- he is deemed to be a poor surgical candidate due to his vascular issues. Depression/anxiety are limiting his ability to concentrate.
>
> He can only walk or stand for a few minutes due to his leg pain.

(*Id.*)

On April 21, 2017, Katila began another series of viscosupplementation injections, first with five injections to the left knee (*id.* at 1154-1162), followed by five more to the right knee.  (*Id.* at 1165-1178.)

13

On May 9, 2017, Katila saw Dr. Young for a follow up visit.  (*Id.* at 1102.)  Dr. Young noted Katila had finished his six-month course of Xarelto for his right leg DVT.  (*Id.*)  Katila reported the "same issues" with his knees and that he was doing injections.  (*Id.*)  On examination, Dr. Young found some edema of the extremities.  (*Id.* at 1103.)

On August 11, 2017, Katila saw Dr. Cohn for follow up.  (*Id.* at 1180.)  Katila rated his knee pain as a 3/10.  (*Id.*)  While the injections had improved his nighttime knee pain, Katila reported he was "doing about the same."  (*Id.*)  He continued to use his knee brace and reported that it helped.  (*Id.*)  On examination, Dr. Cohn found bilateral swelling, decreased extension, tenderness to the medial joint line, positive McMurray's, Lachman's, and flexion pinch tests, as well as fixed flexion contracture.  (*Id.* at 1181.)  Dr. Cohn instructed Katila to return in one month and would consider a cortisone shot at the next appointment if Katila had not shown significant improvement.  (*Id.* at 1182.)

On September 22, 2017, Katila saw Dr. Cohn for follow up.  (*Id.* at 1184.)  Katila rated his pain as a 3/10.  (*Id.*)  Katila reported his right knee was doing well.  (*Id.*)  Katila stated he continued to have a hard time doing certain things.  (*Id.*)  Katila told Dr. Cohn he was doing his home exercise program as well as aquatic therapy.  (*Id.*)  On examination, Dr. Cohn found no swelling or tenderness of the right knee.  (*Id.* at 1185.)  While Katila lacked 20 degrees extension and had ten degrees of varus misalignment with three degrees of valgus pseudo laxity, McMurray's test, Lachman's test, and flexion pinch test were all negative.  (*Id.*)  Dr. Cohn found fixed flexion contracture was present and that Katila walked with a limp.  (*Id.*)  Muscle tone and sensation were normal.  (*Id.*)  Dr. Cohn instructed Katila to continue with his home exercise program.  (*Id.* at 1186.)

On November 13, 2017, Katila saw Dr. Hubbard for his annual follow up appointment with echocardiogram.  (*Id.* at 1111.)  Dr. Hubbard found Katila to be doing well from a cardiac standpoint. (*Id.*)  On examination, Dr. Hubbard noted no edema.  (*Id.* at 1112.)  Dr. Hubbard determined the right

popliteal artery was slightly increased in size compared to the previous examination, but Katila's aorta size appeared stable.  (*Id.*)

On November 14, 2017, Katila saw Dr. Young for follow up.  (*Id.* at 1123.)  On examination, Dr. Young found Katila's extremities were normal, with no deformities, skin discoloration, or edema.  (*Id.* at 1127.)  Dr. Young also found normal pulses bilaterally.  (*Id.*)

On December 22, 2017, Katila saw Dr. Cohn for follow up.  (*Id.* at 1192.)  Katila rated his right knee pain as a 4/10.  (*Id.*)  Katila reported his right knee had been hurting more than his left, and stated he wanted to have viscosupplementation injections again.  (*Id.*)  On examination, Dr. Cohn found swelling, decreased extension, tenderness to the medial joint line, patellofemoral compression pain, positive McMurray's and flexion pinch tests, and fixed flexion contracture.  (*Id.* at 1193.)  Katila walked with a limp and was unable to squat.  (*Id.*)  Dr. Cohn found Katila's muscle tone and sensation were normal. (*Id.*)  Dr. Cohn did not examine Katila's left knee.  (*Id.*)  Dr. Cohn instructed Katila to continue with his home exercise program and recommended viscosupplementation injections at the next visit if Katila had not shown significant improvement by then.  (*Id.* at 1194.)

X-rays taken that same day revealed "bone-on-bone" changes above the medical compartment of the knee bilaterally.  (*Id.* at 1212.)  The x-rays also showed 15° of varus malalignment bilaterally.  (*Id.*) These findings were "consistent with advanced osteoarthritis involving both knees."  (*Id.*)

## C.  State Agency Reports

On February 6, 2017, Esberdado Villanueva, M.D., reviewed Katila's records and opined that Katila could occasionally lift 20 pounds, frequently lift ten pounds, stand and walk for two hours in an eight-hour work day, sit for about six hours in an eight-hour work day, and had an unlimited ability to push/pull other than shown for lifting and carrying.  (*Id.* at 96.)  While Katila could occasionally climb ramps and stairs, he could never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Villanueva found Katila's

15

ability to balance, stoop, kneel, crouch, and crawl unlimited.  (*Id.* at 96-97.)  Katila must avoid all exposure to hazards.  (*Id.* at 97.)

On May 1, 2017, Stephen Sutherland, M.D., reviewed Katila's records and opined that Katila could occasionally lift ten pounds, frequently lift ten pounds, stand and walk for two hours in an eight-hour day, sit for about six hours a day, and was limited to occasional pushing and pulling of the bilateral lower extremities.  (*Id.* at 113.)  Katila could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.* at 113-14.)  Katila could occasionally kneel and crawl.  (*Id.* at 114.)  Dr. Sutherland found Katila's ability to balance, stoop, and crouch unlimited.  (*Id.*)  Katila must avoid all exposure to hazards and avoid concentrated exposure to extreme cold.  (*Id.*)

On May 9, 2017, Michelle Holmes, M.D., reviewed the physical residual functional capacity ("RFC") assessment.  (*Id.* at 1048.)  Dr. Holmes agreed with all symptoms and limitations found by the previous Disability Determination Services reviewers.  (*Id.*)  Dr. Holmes opined:

> Claimant with multiple illnesses but appears most limited by DJD of bilateral knees, not able to get surgery because of peripheral arterial disease of the LEs as well.  HE [sic] also has obesity, diabetes.
>
> However, the PAD is not at listing level (required diagnostic pressures not reported).  On medical CE 2/2017 clmt uses cane for ambulation, but is able to have a slow steady gait w/out a cane.  There are no ADLS reported.  However, a MSS (Dr. Young) on 4/17/17 states that he can only walk or stand a few minutes due to leg pain.
>
> ASSESSMENT   The sedentary RFC as stated is consistent with the MER and is supported.

(*Id.*)

On February 25, 2018, Jose Rabelo, M.D., reviewed Katila's file.  (*Id.* at 1141.)  He determined no listing level was met or equaled and there was no additional medical evidence of record to further reduce the RFC in the file.  (*Id.*)  Therefore, he agreed with the RFC in the file.  (*Id.*)

**D.**     **Hearing Testimony**

During the September 28, 2018 hearing, Katila testified to the following:

- Katila lived in a two-story house with his 17-year-old son.  (Tr. 49-50, 52.)  He sleeps downstairs, but the shower is upstairs.  (*Id.* at 52.)  He climbs the stairs about three times a day.  (*Id.*)  It is hard for him to climb the stairs.  (*Id.*)  Five years ago, he fell down the steps after losing his balance near the top.  (*Id.*)  The house does have a basement.  (*Id.*)  The last time he was down there was the day before the hearing to straighten up some things, as he was in the process of selling the house and needed to get it ready for a showing.  (*Id.* at 53.)  The basement is mainly for storage.  (*Id.*)

- He has two small dogs, but he cannot take them for walks.  (*Id*. at 53.)

- He has a Bachelor of Fine Arts degree in visual communication design.  (*Id.*)  He last worked in 2012 as a digital strategist.  (*Id.* at 54.)

- He drove himself to the hearing.  (*Id.* at 50.)  Sometimes he has "unbearable" pain in his right leg when he tries to drive, and he will have to stop the car.  (*Id.*)

- He walked into the hearing with a cane.  (*Id.*)  He has been using a cane for several years.  (*Id.*)  No doctor prescribed the cane, but when visiting his dad, Katila mentioned he was going to get a cane.  (*Id.*)  His dad offered him one of his, and that is when he started using one.  (*Id.*)  Which hand he uses to hold the cane depends on which knee is bothering him; sometimes it is his left, sometimes it is his right.  (*Id.* at 50-51.)  However, he favors his right hand, as he is right-handed.  (*Id.* at 51.)  He uses his cane when he goes out.  (*Id.* at 61.)  Around the house he uses counter tops and furniture.  (*Id.*)  When he shops, he braces himself on the shopping cart and does not use the cane.  (*Id.*)

- The neuropathy in his hands is the same in both.  (*Id.* at 51.)  He gets tingling in his hands and it gets worse throughout the day.  (*Id.* at 70.)  He has not been dropping things.  (*Id.* at 71.)

- He has lost about 60-70 pounds, which he attributed to eating less.  (*Id.* at 51-52.)  The weight loss made him a little more mobile.  (*Id.* at 52.)  He did not exercise to lose weight.  (*Id.*)

- The pain in his legs prevents him from concentrating for the most part.  (*Id.* at 61.)  He can sit for short periods of time, "but then it becomes very distracting" for him.  (*Id.*)  If he does not have to lie down or put his feet up, he must interrupt what he was doing to stretch his legs.  (*Id.*)  He cannot sit for too long or walk for very long, and together that keeps him from doing the kind of work he used to do.  (*Id.*)  He has good days and bad days, but generally he can sit for 15-20 minutes.  (*Id.*)  He can stand for about five minutes.  (*Id.*)   He can walk for five minutes without any support.  (*Id.*)  He can walk with his cane for 15-20 minutes before he gets pain in his

17

calves or his knee and needs to rest for at least five minutes before walking again. (*Id.* at 77.)  He lays down for a total of an hour throughout the day. (*Id.* at 74-75.)

- He can still do light housework, but it takes him "about four times as long as it used to." (*Id.* at 62.)  He also cooks a little and keeps his house straightened up. (*Id.*)  His son does the yard work, like cutting the grass and shoveling snow. (*Id.*)  He grocery shops three times a week so his trips are shorter. (*Id.*)  He cooks things like Beef-a-Roni and macaroni and cheese. (*Id.*)  He could probably lift a ten-pound bag of potatoes and carry it across his kitchen if he had to, although he generally has his son bring the groceries in. (*Id.* at 78.)

- He currently sees Dr. Cohn, an orthopedic surgeon, for his knee conditions. (*Id.* at 62.)  While Dr. Cohn told him he needs two knee replacements, he is not a good candidate because of his peripheral vascular disease. (*Id.* at 63.)

- He wears compression stockings every day but is using a brace for his left knee intermittently as it started to get uncomfortable for him. (*Id.*)  His diabetes is well controlled, and he checks his blood sugar monthly. (*Id.*)  He takes 11 or 12 medications. (*Id.* at 63-64.)  He uses a CPAP machine for his obstructive sleep apnea. (*Id.* at 64.)  The gel injections he gets in his knees provide him relief for five to six months before he needs to start getting them again. (*Id.* at 65.)  The injections mitigate his pain, so it is not so acute and sharp. (*Id.* at 73.)  When the injections start to wear off, the pain gets a lot sharper. (*Id.*)

- His left leg has not improved since the bypass surgery. (*Id.* at 70.)  He still has neuropathy in his feet pretty much every day. (*Id.*)

- His family lives in Painesville and his sees his father n a regular basis. (*Id.* at 66-67.)  He gets together with a pastor of a home church once or week or once every two weeks. (*Id.* at 67.)  He reads four to ten books a month. (*Id.*)  He goes to AA meetings four to five nights a week. (*Id.* at 68.)  He uses a computer about half an hour a day. (*Id.* at 69.)  He uses his smartphone about half an hour a day. (*Id.* at 71.)

The VE testified Katila had past work as a marketing advisor or director and advertising agent executive. (*Id.* at 59-60.)  The ALJ then posed the following hypothetical question:

> Mr. Burkhammer, you've already classified past relevant work for us, so we are going to move on to hypotheticals and I do have a number of them for you today. With each hypothetical, I do want you to assume somebody of Mr. Katila's age, education, as well as the job history you previously described for us. Now the first hypothetical individual will be at the sedentary exertional range and have the following additional limitations. He could occasionally push, pull, and operate foot controls with the bilateral lower extremities and he would need a cane when ambulating. He could never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl. Now he could frequently handle and finger with the

18

> bilateral upper extremities. He should avoid concentrated exposure to extreme cold and vibrations and avoid all exposure to hazards such as unprotected heights -- hold on one second -- such as unprotected heights, moving mechanical parts, and the operation of motor vehicles. Would that hypothetical individual be able to perform any of claimant's past relevant work?

(*Id.* at 80-81.)

The VE testified the hypothetical individual would be able to perform Katila's past work as a marketing advisor or director and advertising agent executive as described by the DOT, but not as performed. (*Id.* at 81.)

The ALJ then posed a second hypothetical:

> In this hypothetical question, the definition of sedentary will be further defined as the individual could sit six hours in an eight-hour workday, could stand and/or walk two hours in a eight- hour workday, but the standing would be limited to 10-minute intervals and the walking would be limited to five-minute intervals. What impact, if any, would that have on the ability to do past relevant work, at least as defined in the DOT?

(*Id.*)  The VE testified that while he was "not absolutely positive," those were "strict limitations" and would not allow someone to perform the claimant's past relevant work.  (*Id.*)

The ALJ then posed a third hypothetical:  "[I]f we further kind of define sedentary not only to include the standing and walking intervals, but also indicated that sitting would be limited to 20-minute intervals, then I take it that your answer would also be no to past relevant work under the third hypothetical?"  (*Id.* at 81-82.)  The VE testified that was correct.  (*Id.* at 82.)  The ALJ then posed a fourth hypothetical, modifying the first hypothetical to add occasional handling and fingering.  (*Id.*)  The VE testified such an individual could not perform Katila's past relevant work.  (*Id.*)  The ALJ then posed a fifth hypothetical, modifying the first hypothetical so the individual needed to occasionally elevate his or her legs up to a 45-degree angle.  (*Id.*)  The VE testified if that limitation had to be maintained throughout the day, it would prevent the performance of Katila's past relevant work.  (*Id.*)  The ALJ then posed a sixth hypothetical, modifying the first hypothetical to add that while "this individual  could perform both

19

simple and complex tasks, he wouldn't be able to perform tasks at a production rate pace such as assembly line work." (*Id.* at 82-83.) The VE testified that he did not believe "strict quotas" were part of the jobs identified as Katila's past relevant work. (*Id.* at 83.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §

404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Katila was insured on his alleged disability onset date, March 1, 2014, and remained insured through December 31, 2017, his date last insured ("DLI.")  (Tr.  15.) Therefore, in order to be entitled to POD and DIB, Katila must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 1, 2014 through his date last insured of December 31, 2017 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: obesity, peripheral vascular disease (PVD) and peripheral arterial disease (PAD), chronic venous insufficiency, deep vein thrombosis (DVT) of bilateral lower extremities, thoracic aortic aneurysm without rupture, popliteal aneurysm status post bypass surgery and popliteal artery embolism, enlarged aortic root, hypertension, hyperlipidemia, type 2 diabetes mellitus with diabetic polyneuropathy, osteoarthritis of bilateral knees, skin avulsion and cellulitis of left leg and obstructive sleep apnea (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to

perform sedentary work as defined in 20 CFR 404.1567(a) except that he could occasionally push, pull and operate foot controls with the bilateral lower extremities, and he would need to use a cane when ambulating.  He could never climb ladders, ropes or scaffolds, and could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl.  He could frequently handle and finger with the bilateral upper extremities.  He should avoid concentrated exposure to extreme cold and vibrations, and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and operation of a motor vehicle.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a marketing supervisor/director and advertising executive.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from March 1, 2014, the alleged onset date, through December 31, 2017, the date last insured (20 CFR 404.1520(f)).

 (Tr. 17-27.)

## V.    STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio

23

Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    First Assignment of Error: The ALJ erred in weighing the opinion of Dr. Young

Katila argues "the record is strongly supportive of Dr. Young's opinions" that Katila could only stand or walk for a few minutes as a result of his leg pain, "and the ALJ's attempts to discount the opinions is [sic] unavailing."[3]  (Doc. No. 15 at 19, 21.)  Katila further argues that reversal is required because while the ALJ found Dr. Young's opinions were not entitled to controlling weight, the ALJ never assigned any specific weight to Dr. Young's opinions, in violation of *Gayheart v. Commissioner of Social Security*, 710 F.3d 365 (6th Cir. 2013).  (*Id.* at 21.)

The Commissioner argues the ALJ gave good reasons for discounting Dr. Young's opinion.  (Doc. No. 17 at 9.)  Furthermore, even if the ALJ should have stated what weight he assigned to Dr. Young's opinion, that error is harmless "as he discounted the entirety of Dr. Young's opinion regarding Plaintiff's physical impairments, and it is therefore clear he intended to give no weight to Dr. Young's opinion regarding Plaintiff's physical impairments."  (*Id.* at 10) (citations omitted).  In addition, the Commissioner asserts the ALJ "otherwise indirectly undermined Dr. Young's opinion."  (*Id.*)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a

---

[3] Katila fails to specify the basis of this argument; it is unclear whether he asserts the ALJ should have given Dr. Young's opinion controlling weight, the ALJ failed to give "good reasons" for discounting Dr. Young's opinion, the ALJ failed to comply with 20 C.F.R. § 404.1527 in this respect in addition to failing to assign the opinion specific weight, etc., or whether he invites the Court to reweigh the evidence.

medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*   In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting SSR No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

---

[4] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 F. Reg. 5844 (March 27, 2017). SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Moreover, the "treating physician rule" only applies to medical opinions. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 F. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014).

26

The Sixth Circuit has determined that Social Security regulations require not just an explanation why treating source opinions "do not warrant controlling weight," but also "what weight was given the treating opinions." *Rogers*, 486 F.3d at 246.

The Sixth Circuit has identified the following circumstances where a violation of the treating source rule constitutes harmless error: 1) where a treating source opinion "is so patently deficient that the Commissioner could not possibly credit it"; 2) where "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though [he] has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). "'An ALJ may accomplish the goals of this procedural requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record.'" *Richards v. Comm'r of Soc. Sec.*, No. 1:13 CV 1652, 2014 WL 4421571, at *9 (N.D. Ohio Sept. 8, 2014) (quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72) (6th Cir. 2006)) (emphasis in original).

The ALJ weighed and considered Dr. Young's April 2017 opinion as follows:

> As for the opinion evidence, Dr. Young noted in a letter dated April 18, 2017, that he saw the claimant for a disability evaluation. He noted that the claimant had worsening leg pain over 5 years and saw a vascular physician and orthopedic physician for arthritic knees. He was deemed to be a poor surgical candidate due to vascular issues. Dr. Young opined that the claimant's depression and anxiety limit his ability to concentrate and he could only walk or stand for a few minutes due to leg pain (Ex. 12F, 1). I do not give controlling weight to Dr. Young's opinion as there is no objective evidence supporting no more than mild limitations in the claimant's ability to concentrate, and he did not provide a definitive limitation regarding concentration nor define "few minutes" in his opinion.

(Tr. 26.)

After review of the ALJ's decision and the record, the Court finds the error in not assigning specific weight to Dr. Young's opinion is harmless as it is clear the ALJ discounted Dr. Young's

opinion for lack of specificity.  Furthermore, the ALJ indirectly attacked Dr. Young's opinion through his treatment of the record, the additional opinion evidence of record, and Katila's credibility.  *Richards*, 2014 WL 4421571, at *10.  "Therefore, the goals of the treating physician rule have been satisfied."  *Id.* (citations omitted).

The ALJ directly attacked Dr. Young's opinion regarding Katila's ability to stand and walk by citing Dr. Young's failure to define "a few minutes" in his opinion as a reason for not giving controlling weight to his opinion.  (Tr. 26.)  As the Commissioner points out, Dr. Young failed to specify whether Katila could stand and walk for "a few minutes at a time, a few minutes in an hour, or a few minutes in a workday."  (Doc. No. 17 at 10.)  The Court agrees that Dr. Young's opinion is vague insofar as it does not sufficiently explain what Katila can do despite his physical impairments. *See Anderson v. Comm'r of Soc. Sec.*, 1:18CV0070, 2018 WL 7199514, at *15 (N.D. Ohio Dec. 21, 2018), *report and recommendation adopted by* 2019 WL 415244 (N.D. Ohio Feb. 1, 2019). Vagueness is a valid reason to discount a treating source's opinion.  *See id.*  *See also* 20 C.F.R. § 404.1527(c)(3) ("Supportability.  The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.  The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.")

The ALJ also indirectly attacked Dr. Young's opinion in a variety of ways.  First, the ALJ indirectly attacked Dr. Young's opinion through his treatment of the standing and walking limitations opined by Dr. Duncan.  The ALJ weighed this opinion as follows:

> Dr. Duncan opined that the claimant may have difficulty standing more than 10 minutes, sitting more than 20 minutes, walking more than 5 minutes or climbing a flight of stairs.  Although Dr. Duncan had the opportunity to evaluate the claimant, the limitations she asserts in standing, walking and sitting are not supported by her examination.  In manual muscle testing, she noted the claimant's strength was 5/5, without

> spasticity or atrophy and his gait was normal as well as his range of
> motion. Thus, I give partial weight to Dr. Duncan's opinion, but only to
> the extent that it supports a sedentary level of exertion with limited
> standing and walking.

(Tr. 26.) This analysis also undermines Dr. Young's vague opinion regarding standing and walking

limitations, as Katila appears to recognize. (Doc. No. 15 at 20.) Katila also challenges the sufficiency of

the ALJ's analysis of Dr. Duncan's opinion regarding his ability to sit, stand, and walk. (*Id.* at 20-21.)

But his arguments go to the weight assigned to the evidence, not a lack of analysis, and it is not for the

Court to reweigh the evidence.

Second, the ALJ indirectly attacked Dr. Young's opinion through his analysis of the state agency

reviewing physicians' opinions:

> State agency Esberdado Villanueva M.D., assessed a sedentary level of
> exertion reduced by never climbing ladders, ropes or scaffolds, occasionally
> climbing ramps and stairs, avoiding exposure to hazards i.e., heavy machinery
> and unprotected heights (Ex. 1A).
>
> State agency medical consultant Stephen Sutherland, assessed a sedentary
> range of exertion with occasional push/pull with the bilateral lower
> extremities, use of a cane to ambulate, never climbing ladders, occasional
> stairs, kneeling and crawling, avoid concentrated exposure to extreme cold,
> and exposure to hazard i.e., heavy machinery and unprotected heights (Ex.
> 3A).
>
> State agency medical consultant Jose Rabelo, M.D., opined on February 25,
> 2018 that there was no additional evidence to reduce the residual functional
> capacity (Ex. 20F).
>
> State agency medical consultant Michelle Holmes concurred with Dr.
> Sutherlands opinion for a sedentary residual functional capacity. She noted
> that the claimant appeared mostly limited by degenerative joint disease of his
> knees and he could not have surgery due to peripheral arterial disease;
> however, it was not at listing level (Ex. 14F).
>
> I give considerable weight to the State agency consultants relative to their
> opinion for a sedentary range of exertion consistent with the claimant's severe
> physical impairments.

(Tr. 26-27.)  The Court notes the state agency reviewing physicians on reconsideration and subsequent file review had the benefit of Dr. Young's opinion.  (*Id.* at 105, 1048-49, 1141.)  In addition, Katila does not challenge the weight assigned to the state agency reviewing physicians' opinions.

The ALJ also indirectly attacked Dr. Young's opinion through his discussion of the medical records and Katila's subjective symptoms.  In his discussion of the medical records, the ALJ noted that despite rating his knee pain as a 4/10 at a March 2018 appointment with Dr. Cohn, Katila reported the injections helped and he continued his home exercise program.  (*Id.* at 24.)  The ALJ found this evidence "demonstrate[d] that [Katila] responded to treatment with the injections" and his decreased pain levels were "inconsistent with pain that would interfere with his ability to concentrate and focus."  (*Id.*)  The ALJ also found that while Katila told Dr. Peralta he could only walk three to five minutes before his calves began to cramp, Dr. Peralta found "minimal change due to his right popliteal artery aneurysm and his pain was related to osteoarthritis."  (*Id.*)

After his thorough analysis of the medical evidence, the ALJ found as follows:

> The evidence establishes advanced osteoarthritis of the claimant's knees by imaging, as well as mild peripheral artery disease and peripheral vascular disease, which contribute to limitations walking and standing, as well as postural changes, which I considered in limiting climbing ramps and stairs to occasional as well as occasionally balancing, stooping, kneeling, crouching and crawling. While the claimant reported that his father gave him a cane, the evidence supports the obligatory requirement for a cane, which I provided for in the residual functional capacity above.

> The evidence shows that the claimant responded to injections of his knees with decreased rating of his pain from 2-4 out of 10, with treatment consisting of Tylenol and Motrin. Although reporting he could only walk for short distances before having to rest, the claimant remained ambulatory and achieved a 40 pound weight loss secondary to obesity.

(*Id.*)  The Court notes Katila does not challenge the ALJ's treatment of the medical record evidence, nor the ALJ's subjective symptom analysis.

It is not for the Court to reweigh the evidence, which is mixed regarding Katila's physical limitations.  The fact Katila would have weighed or interpreted the evidence differently is not grounds for remand.

The procedural rule set forth in § 404.1527 "is not a procrustean bed, requiring an arbitrary conformity at all times."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).  Under the circumstances presented in this case, the ALJ's opinion is sufficient for the Court to trace the path of his reasoning and understand the treatment of Dr. Young's opinion.  A perfect opinion is not required. *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game."). Therefore, the ALJ's failure to assign specific weight to Dr. Young's opinion is harmless error.

**B.     Second Assignment of Error: The ALJ erred in evaluating the vocational evidence and in failing to resolve significant conflicts in that evidence**

In his second assignment of error, Katila asserts the ALJ erred at Step Four when he relied on the VE's testimony without noting or discussing other vocational evidence in the record, as well as without resolving the conflicts between the VE's testimony and the other vocational evidence in the record.  (Doc. No. 15 at 23.)  The other vocational evidence Katila directs the Court to is a February 16, 2017 vocational evaluation by state agency vocational consultant Donald Solt.  (*Id.*)  Mr. Solt classified Katila's past work as two "composite jobs," which Katila asserts would make the ALJ's denial at Step Four error.  (*Id.* at 23-24.)

The Commissioner argues Katila waived any Step Four challenge when he was represented by counsel below[5] and failed to cross-examine the VE about any potential conflicts, and when he failed to raise the "composite jobs" classification issue at the hearing.  (Doc. No. 17 at 14-15.)  In addition, the Commissioner argues the VE's testimony constituted substantial evidence supporting the ALJ's Step Four finding, and there is no requirement that the ALJ resolve conflicts between two VEs or by state agency employees.  (*Id.* at 14.)

There are "three possible tests" for determining whether a claimant retains the capacity for past relevant work:

> 1. Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g., "delivery job," "packaging job," etc.
>
> Finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable.
>
> * * *
>
> 2. Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.
>
> Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be "not disabled."
>
> 3. Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy.  (The *Dictionary of Occupational Titles* (DOT) descriptions can be relied upon--for jobs that are listed in the DOT -- to define the job as it is *usually* performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.

---

[5] The Court notes counsel below was different than counsel representing Katila on judicial review.  (Tr. 15.)

> A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

SSA, TITLES II & XVI: PAST RELEVANT WORK-THE PARTICULAR JOB OR THE OCCUPATION AS GENERALLY PERFORMED, SSR 82-61, 1982 WL 31387 (Jan 1, 1982).

The Court agrees Katila waived any challenge to the VE's testimony classifying his past work as separate jobs, as counsel below "did not dispute or otherwise question" the VE's testimony on this issue. *Dempsey v. Saul*, No. 1:18CV2806, 2020 WL 1852631, at *5 (N.D. Ohio Apr. 13, 2020) ("The Sixth Circuit Court of Appeals and many other courts have held that a claimant's failure to object to a VE's testimony at the ALJ's hearing waives his or her right to raise such issues in the district court.") (citations omitted).

With respect to any conflict between the testifying VE and the opinion by Mr. Solt, as this district has stated:

> [T]here is no requirement that the ALJ resolve conflicts between vocational evidence provided by either state agency employees or by other VEs. (Tr. 282-92, 489). These are opinions, and thus can be weighed accordingly when reviewing the entirety of the record. Here, VE Mosley based her opinion upon a review of the record evidence and Plaintiff's testimony about her job duties and physical requirements; the ALJ was entitled to rely on her experience in concluding what job title most closely mirrored Plaintiff's past work.

*Harrington v. Comm'r of Soc. Sec.*, No. 1:14 CV 1833, 2015 WL 5308245, at *7 (N.D. Ohio Sept. 10, 2015). Like Harrington, Katila "cites to no authority which requires the ALJ to review, let alone resolve conflicts, between opinion evidence of the VEs or state employees." (*Id.*) Like Harrington, Katila failed to raise this issue at the hearing so the ALJ could discuss this potential conflict with the testifying VE. (*Id.*)

33

The ALJ did not err in relying on the VE's testimony at the hearing in making his Step Four finding.

### VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


Date:  September 4, 2020                           _s/ Jonathan Greenberg_
                                                   Jonathan D. Greenberg
                                                   United States Magistrate Judge

34